**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190740-U

Order filed March 17, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* L.T., M.D., M.O., & A.P., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Minors | ) | Peoria County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | Appeal Nos. 3-19-0740, 3-19-0741 |
| | ) | 3-19-0742, 3-19-0743 |
| Petitioner-Appellee, | ) | Circuit Nos. 16-JA-140, 16-JA-141 |
| | ) | 16-JA-142, 17-JA-91 |
| v. | ) | |
| | ) | |
| C.T., | ) | |
| | ) | Honorable David A. Brown, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Carter and Holdridge concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court properly found respondent unfit and terminated her parental rights.

¶ 2    Following an incident involving respondent, C.T., the Department of Children and Family Services (DCFS) investigated, leading to the suggestion of a safety plan for the three minors involved at that time. Before the plan was initiated, the father fled with the minors. The minors

were eventually located in Marion, Illinois, adjudicated neglected by way of an injurious environment and placed with their maternal grandmother. During the pendency of those proceedings, respondent gave birth to another child. Subsequently, that child was adjudicated neglected and placed with the grandmother. The State filed a petition to terminate respondent's parental rights as to all the minors due to respondent's failure to make reasonable progress during the relevant time period. Following a fitness hearing, the circuit court found the mother unfit for failing to make reasonable progress. After the best interests hearing, the court found it to be in the best interests of the minors to terminate respondent's parental rights. Respondent challenges both findings. For the reasons set forth below, we affirm.

¶ 3                                I. BACKGROUND

¶ 4        In May 2016, respondent experienced a heroin overdose while three of the four minors at issue were present in the home. Police responded and respondent was hospitalized. After this incident, DCFS received a hotline report about respondent's overdose among other issues. On June 3, 2016, a DCFS investigator visited respondent's home to investigate the hotline report. During the visit, respondent, three of her children, L.T., M.D., and M.O., and the minors' father were present. The investigator determined a safety plan for the minors was appropriate due to respondent's overdose. The father would remain the caretaker for the minors and a third party would supervise respondent's interaction with the minors. While the investigator was filling out the safety plan, the father and the minors went to the backyard. It was there that the father passed each of the minors over the backyard fence to a waiting family friend. The father fled with the minors in the friend's car. The father notified DCFS that he never intended to sign the safety plan and, instead, was stalling until the family friend arrived.

¶ 5    The State filed a petition for adjudication of wardship shortly thereafter. The petition alleged the minors were neglected due to an injurious environment. The counts of the petition described respondent's substance abuse issues, mental health issues, the fleeing incident, and the father's criminal history. The circuit court entered an order for temporary shelter care and issued a juvenile warrant for the minors. On June 16, 2016, DCFS investigators located the minors in Marion, Illinois, and placed them with their maternal grandmother, who also resides in Marion. The court held an adjudicatory hearing finding the allegations in the petition proven by a preponderance of the evidence, deeming the minors neglected by reason of an injurious environment.

¶ 6    The court held a dispositional hearing in December 2016, finding respondent unfit based on the allegations of a drug overdose, her mental health issues, and domestic violence between respondent and the minors' father. The minors were made wards of the court. The court ordered respondent to complete services in order to correct the conditions that caused the minors to be removed. Respondent was ordered to execute all authorizations for release of information, cooperate fully and completely with the agencies, obtain a drug and alcohol assessment and complete any follow-up treatment recommended, perform random drug drops twice a month, submit to a psychological exam and complete any follow-up treatment recommended, complete domestic violence counseling, obtain and maintain stable housing, and attend supervised visits with the minors. It was also ordered that respondent complete a parenting class, which the court noted had already been completed.

¶ 7    On March 13, 2017, respondent gave birth to A.P. Respondent checked into the hospital under an assumed name and would not submit to drug testing at the hospital. DCFS records indicate respondent asked hospital staff to remove the infant's security monitor device. Afterward,

she stepped out of the nursery with the newborn. A.P.'s umbilical cord blood tested positive for cocaine. DCFS filed a petition for shelter care of A.P. The petition stated that respondent was previously found unfit and had not completed any services. Also, respondent was still in a relationship with the father, had unresolved substance abuse and mental health issues, and a pending criminal charge for forgery. The court granted the petition and ordered no visitation with A.P. due to respondent's attempt to flee with the newborn at the hospital. DCFS placed A.P. with her three older siblings with the grandmother in Marion. The court held a dispositional hearing in September 2017, finding respondent unfit. The court ordered respondent to complete services similar to the previously ordered services. Respondent was incarcerated from April 29, 2017, through September 26, 2017, for theft and possession of stolen property.

¶ 8        In March 2018, the court held a permanency review hearing. The court found that due to the failure of respondent to make reasonable efforts toward the return of the minors, the goal for L.T., M.D., and M.O. would change from return home pending status to substitute care pending court decision to terminate parental rights. The goal for A.P. changed from return home within one year to return home pending status. In September 2018, the court, again, found respondent was not making reasonable efforts toward the return home of A.P., changing the goal from return home pending status to substitute care pending court decision to terminate parental rights.

¶ 9        In March 2019, the State filed petitions seeking the termination of respondent's parental rights as to all four of the minors. The petitions alleged that respondent was unfit as defined in section 1(D)(m)(ii) of the Adoption Act (Act) (750 ILCS 50/1(D)(m)(ii) (West 2016)) for failing to make reasonable progress toward the return of the minors during the nine-month period of January 1, 2018, to October 1, 2018.

¶ 10 At the fitness hearing, the State asked the circuit court to take judicial notice of the associated case files, which the court did. The State then entered exhibits into evidence without objection. The exhibits included the minors' visitation records and reports, records from the Center for Prevention of Abuse (Center), drug drop log, a certified copy of respondent's guilty plea to the 2018 charge of retail theft, respondent's medical records from UnityPoint Health, and respondent's May 2016 psychiatric evaluation prepared for an unrelated case.

¶ 11 The State then called Kim Rashid to testify. Rashid was the DCFS caseworker assigned to the matters at issue in this consolidated appeal. She testified that respondent had not completed any services required beyond the parenting class completed before the relevant time period. Respondent told Rashid that in January 2018, she was homeless and staying with friends and at the Dream Center. Rashid encouraged respondent to seek mental health and substance abuse treatment. To her knowledge, respondent never did so. Respondent scheduled a psychological evaluation, but never attended. Visits between respondent and the minors occurred in January, February, May, and June. The visits went well with reports from the visits depicting respondent as a caring mother. Rashid did note that during one visit, respondent appeared to be under the influence resulting in her being "groggy" and "falling asleep." Respondent did not have any visitation with the minors after June 2018.

¶ 12 In March 2018, respondent checked into a women's shelter at the Center and enrolled in domestic violence courses. The Center alerted DCFS that it terminated respondent from the domestic violence classes because she only attended two out of seven sessions since her admission. After leaving the Center, respondent moved into a one-bedroom apartment with the minors' father. Rashid expressed concern to respondent about this due to the fact neither had completed their court-ordered domestic violence classes. She conducted a safety check on the apartment, finding

that aside from the threat of domestic violence from the father and respondent living together, the home was free of safety concerns.

¶ 13    When asked whether respondent had any police contact during the relevant time period, Rashid stated she was aware of an incident of domestic violence as well as an arrest, both occurring in March. As to the domestic violence, she stated that the father bit respondent because he saw her coming out of another man's house. Respondent stated she understood why the incident occurred and tried to minimize it. As to the arrest, she received a police report indicating that police stopped respondent and the father in a vehicle displaying stolen plates. Police arrested respondent for driving without a valid license and possession of stolen plates. The police report indicated that respondent was pregnant, had potentially overdosed on Xanax, and was hospitalized. The report also detailed that respondent threatened self-harm while at the hospital following the arrest. Respondent attempted to minimize the arrest and neither confirmed nor denied the overdose.

¶ 14    In July 2018, Rashid received another police report detailing an incident where the father kicked respondent in the face. Respondent attempted to minimize the incident, claiming it was an accident. She, again, was referred to domestic violence classes but was terminated after failing to attend. Respondent completed 4 out of 20 drug drops. Two were positive for drugs.

¶ 15    The State then called Peoria police officer Jennifer Metcalf to the stand. Metcalf stated she has worked for the police department for 26 years and was working March 19, 2018, around 2 p.m. She described an incident with respondent. Respondent came to the police station and reported that a day or so before, she had been in an altercation with the father of her children. She claimed the father had bitten her, was going to kill her, and was going to "put a hit out" on her friend. Metcalf contacted the father; he claimed that respondent had inflicted the injury upon herself and

denied making any threats. She believed the father said respondent used a key to make the marks complained of as a bite injury.

¶ 16    Respondent testified. When asked whether she had looked into any services with respect to substance abuse assessment, counseling, mental health services, or drug drops, respondent asserted, "Yes. I did mental health, and he said he didn't think I really needed it because the diagnoses I had before would not be the ones I would have now." Regarding the substance abuse referral, she stated, "with it only being one incident that they wouldn't—they couldn't take me for a group." When asked about her psychological exam, respondent described how she scheduled the exam but was unable to attend because she was incarcerated. She explained to the court how she had been dismissed from domestic violence classes twice. When asked on cross-examination the date she sought out the services at Tazwood, respondent could not remember the dates or who she talked to explaining, "I went to Tazwood, and he did a little assessment on me. And he said he didn't feel that I needed to do all of my classes." Respondent was incarcerated in a county jail from March 21 through to July 19, 2018. The minors were not brought to visit her while she was in jail. In September, respondent pled guilty to retail theft. The court sentenced her to 1½ years in jail followed by a year of mandatory supervised release.

¶ 17    The circuit court entered an order finding the allegations contained within the petition proven by clear and convincing evidence. The court noted that no domestic violence classes were being completed, "poor attendance at visits, basically no services completed other than a parenting class that was done well before the relevant time period, no drops or dirty drops, continuing criminality, and so the cases have never progressed to the point where we were getting close to the return of the kids home. As a matter of fact, we're going in the opposite direction."

¶ 18    During the best interests hearing, the State adduced evidence that showed the minors were in relative placement with the maternal grandparents. DCFS and the court-appointed special advocate both submitted reports regarding the best interests of the minors. The reports depict a caring, loving family environment in the grandmother's home. Given the age of some of the minors when they were removed from respondent's care, they have only ever known their grandmother as their caretaker. They all demonstrated a strong bond with the grandparents and looked to them to fulfill their needs. The grandparents were willing to adopt the minors. DCFS found it to be in the best interests of the minors for respondent's parental rights to be terminated.

¶ 19    Respondent testified during the hearing. Respondent was incarcerated during the hearing but anticipated she would be released in just over a month and had located suitable housing near the minors in Marion. The father would be living with her. She was engaging in therapy while incarcerated and planned on participating in a mental health assessment once released to continue therapy if needed. She described her emotional bond with each one of her children in detail.

¶ 20    Rashid also testified. To her knowledge, respondent had not visited the minors since June 2018. In November 2018, respondent birthed her fifth child in her home. The father delivered the baby. They avoided contact with DCFS for approximately a week after the birth. Visitation did not resume after the birth of the fifth child because "[respondent] had active warrants out for her arrest as well, so she didn't want to come to the office or anywhere she thought she might be arrested." In March 2019, respondent turned herself in.

¶ 21    After reviewing the statutory best interests factors, the court found it in the minors' best interests to terminate respondent's parental rights.

This appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23 Respondent argues the circuit court committed reversible error by finding her unfit pursuant to section 1(D)(m)(ii) of the Act. 750 ILCS 50/1(D)(m)(ii) (West 2016). She also argues the determination that it was in the best interests of the minors to terminate her parental rights was against the manifest weight of the evidence. The State contends that based on the record the circuit court did not err.

¶ 24 When confronted with a petition to terminate parental rights, the court goes through a two-step process. 705 ILCS 405/2-29(2) (West 2016); *In re D.T.*, 2017 IL App (3d) 170120, ¶ 16. First, it must be shown by clear and convincing evidence that the parent is unfit as defined in the Act. *Id.* (citing 750 ILCS 50/1(D) (West 1998)). If the court finds the parent unfit, the court moves on to determine whether, by a preponderance of the evidence, it is in the best interests of the child that parental rights be terminated. *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990); *In re D.T.*, 338 Ill. App. 3d 133, 154 (2003). We review the circuit court's findings under this two-step process to determine whether they are against the manifest weight of the evidence. *In the Interest of D.M.*, 298 Ill. App. 3d 574, 579, 581 (1998).

¶ 25                          A. Unfitness Finding

¶ 26 Respondent avers although she "had not completed one hundred percent of her services," she made significant progress in addressing her court-ordered services. In support of her argument, she points us to the fact that she signed all requested releases, completed a parenting class prior to the relevant period, completed a substance abuse assessment that recommended no treatment prior to the relevant period, sought the safety of a women's shelter when confronted with domestic violence, completed a psychiatric evaluation in an unrelated matter, and had a home with the father free of safety hazards. The record does not support respondent's assertion she made significant progress.

¶ 27    "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). Reasonable progress exists when the trial court can conclude that compliance with court directives given for the return of the minor is sufficient and of such a quality that the court can order return of the minor to parental custody in the near future. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. "The trial court is to consider evidence occurring only during the relevant nine-month period mandated in section 1(D)(m) in determining whether a parent has made reasonable progress toward the return of the minor." *Id.* ¶ 18.

¶ 28    The record is clear that respondent failed to engage in court-ordered services. Respondent completed 4 out of 20 required drug drops with two testing positive. She was incarcerated during a significant portion of the relevant time period, which offers her no relief from the court's finding she failed to make reasonable progress. See *In re J.L.*, 236 Ill. 2d 329, 342-43 (2010) (finding respondent's incarceration during the relevant time period for demonstrating reasonable progress will not excuse lack of progress and will not toll the relevant time period). She did not complete domestic violence counseling. Additionally, domestic violence continued to take place between her and the minors' father. Respondent testified that once released, she will continue to reside with the father. She failed to complete a psychological exam, even though she claims she completed one in an unrelated criminal matter for the limited purpose of determining her fitness to stand trial. As the State points out, this was before her initial heroin overdose and before the court ordered her to complete the evaluation. Given the limited purpose, the evaluator was not in the position to

recommend follow-up treatment. There is no evidence in the record that respondent completed a substance abuse assessment aside from her self-serving testimony. The circuit court did not find this testimony credible and we defer to that finding. See *D.T.*, 2017 IL App (3d) 170120, ¶ 18 (noting the trial court is in best position to make credibility determinations during the fitness hearing; we defer to those findings).

¶ 29        As the circuit court stated, there was poor attendance at visits, basically no services completed, "dirty drops," and continuing criminality. Clearly, the court concluded it would not be able to return the minors to respondent's custody in the near future. After reviewing the record, the circuit court did not err in finding respondent unfit.

¶ 30                                    B. Best Interests Finding

¶ 31        Respondent argues that the circuit court failed to give sufficient consideration to her youth when these cases began, the family ties of the minors, and the bond between respondent and the minors. Supporting this argument, she claims the grandparents are "not as active as the parents."

¶ 32        Following a finding of unfitness, the focus shifts to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004) "Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphasis in original.) *Id.* The State must prove by a preponderance of the evidence that it is in the best interests of the child that parental rights terminate. *D.T.*, 338 Ill. App. 3d at 154. During the best interests hearing, the full range of the parent's conduct can be considered. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). The court must consider the statutory factors when making the determination of what is in the best interests of the child. 705 ILCS 405/1-3 (West 2016).

¶ 33    Looking to the statutory factors the court was required to examine, the youth of the respondent at the time these cases began is not a consideration the court needed to ponder. As far as the argument that the grandparents are not as "active as the parents[,]" this is not necessarily a consideration that weighs in respondent's favor given the kind of activity the record shows she engaged in during the pendency of these matters.

¶ 34    The circuit court went through each of the statutory factors, evaluating the factual circumstances present, and either finding them neutral or in favor of terminating respondent's parental rights. Respondent was no closer to providing for the physical safety and welfare of the minors at the hearing then when these cases began. "Over the last few years, it hasn't been anything other than basically lack of engagement in services and struggles from a variety of standpoints, mental health ***, substance abuse ***, criminality ***."

¶ 35    Meanwhile, L.T., M.D., and M.O. have been in their grandmother's care for 40 months, A.P. for 31, at the time of the hearing. Two of the older minors undoubtedly have ties to respondent given their age, however, that was not true for the younger minors. While "[r]espondent loves all of her children[,]" it is time to give these children permanence. See *J.L.*, 236 Ill. 2d at 345. As the State points out, respondent prioritized her abusive relationship with the minors' father, drug abuse, and criminal activity over the responsibility to engage in services and improve her life for the benefit of her children. Respondent fails to point to any evidence that would justify reversal of the circuit court's finding. The record supports the circuit court's determination that it was in the best interests of the minors that respondent's parental rights terminate.

¶ 36                                III. CONCLUSION

¶ 37    For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 38    Affirmed.